A. J. NEIMEYER LUMBER COMPANY v. BURLINGTON &
MISSOURI RIVER RAILROAD COMPANY.

| 54 | 321 |
|----|-----|
| 56 | 466 |
| 57 | 561 |

FILED MARCH 17, 1898.   No. 7691.

1. Sales: PLACE OF DELIVERY.  Where delivery of property sold is to
take place is to be determined by the contract between the vendor
and vendee.

2. ———: ———.  If the contract between the parties expressly pro-
vides that delivery shall be made at a certain place, then the
vendor's title to the property is not divested until delivery is so
made.

3. ———: DELIVERY TO CARRIER.  Where the contract between a

vendor and vendee is silent upon the subject of the place of delivery, then the delivery of the property by the vendor to a carrier for transportation, consigned to the vendee, divests the vendor's title to the property, and the vendee's title, from the moment of such delivery to the carrier, attaches.

4. ——: ——. In such a case the carrier is, in contemplation of law, the bailee of the person to whom, and not by whom, the goods are consigned.

5. ——: ——: BILL OF LADING. Where a vendor of goods delivers them to a carrier for transit to his vendee, and causes the goods to be consigned in the bill of lading to himself, his agent, or his order, the presumption arises that he thereby intended to retain the title in himself to the goods. Per RAGAN, C.

6. ——: ——: ——. Where a vendor of goods delivers them to a carrier for transit and causes his vendee to be named in the bill of lading as the consignee of the goods, the presumption arises that the vendor by that act intended the title to the goods to vest. in the vendee on their delivery to the carrier for shipment. Per RAGAN, C.

7. ——: ——: TITLE. The prepayment of freight by a vendor on goods sold and shipped to his vendee is *prima facie* evidence of an intention on the part of the vendor to retain the title to the goods while in transit. Per RAGAN, C.

8. ——: CONSTRUCTION OF CONTRACT: DELIVERY TO CARRIER. The contract between a vendor and vendee set out in the opinion construed, and *held* that the delivery of the property sold took place at the place of its shipment and that the title to the property vested in the vendee on its delivery by the vendor to the carrier for transit to the vendee. Per RAGAN, C.

9. ——: STOPPAGE IN TRANSITU. In order that a vendor of goods may exercise the right of stoppage *in transitu* it is essential that the goods at the time be in transit from such vendor to his immediate vendee. Per RAGAN, C.

10. ——: ——. D. of Omaha ordered a bill of lumber of S. of Dallas, Texas. S. not having the lumber in stock, sent the order to N. at Waldo, Arkansas, requesting him to ship the lumber to D. at Omaha on account of S. and send him the invoice and bill of lading. This was done. While the lumber was in transit S. failed and N. notified the carrier in possession not to deliver the lumber. The carrier delivered to D., the consignee, and N. sued the carrier for conversion. *Held*, (1) That the transaction amounted to a sale and delivery by N. to S. at Waldo; (2) a resale and delivery by S. at Waldo to D.; (3) that the lumber, when it left Waldo, was not in transit from N. to S., but from S. to D.; (4) that N. was not D.'s vendor, but consignor merely, and could not exercise the right of stoppage *in transitu*. Per RAGAN, C.

ERROR from the district court of Douglas county. Tried below before AMBROSE, J.   *Affirmed.*

See opinions for references to authorities.

*A. S. Churchill,* for plaintiffs in error.

*C. J. Greene* and *C. V. Miles, contra.*

RAGAN, C.

C. N. Deitz is a lumber merchant in the city of Omaha, Nebraska, and will be hereinafter designated as Deitz. The A. J. Neimeyer Lumber Company are a corporation engaged in the manufacture and sale of lumber at Waldo, Arkansas, and will be hereinafter designated as Neimeyer & Co.   Simpson, Perkins & Co. are lumber merchants in the city of Dallas, Texas, and will be hereinafter designated Simpson & Co.   The Burlington & Missouri River Railroad Company in Nebraska is a railway corporation organized under the laws of this state and will be hereinafter designated as the railroad company.   About January 1, 1892, Deitz ordered of Simpson & Co. a large quantity of a certain class of lumber.. It appears that Simpson & Co. did not have the material ordered on hand and purchased the lumber to fill the order from Neimeyer & Co., and they, in pursuance of the directions of Simpson & Co., shipped it by rail to Deitz, the bills of lading issued by the initial carrier being made out to Deitz, consignee. Soon after the shipment of this lumber, which consisted of 17 car loads, Simpson & Co. failed and Neimeyer & Co. then notified the railroad company, into whose possession as a common carrier the lumber shipped had come as the last carrier in the line of transit, of the insolvency of Simpson & Co., that the 17 cars of lumber belonged to them, Neimeyer & Co., to hold such lumber, and not to deliver it to Deitz.   It seems that when the railroad company received this notice it had already delivered 6 car loads of the lumber, and disregarding the notice of Nei-

meyer & Co. delivered the other 11 cars also to Deitz, and thereupon Neimeyer & Co. brought this suit against the railroad company in the district court of Douglas county to recover the value of the 11 cars of lumber delivered by it to Deitz after receiving notice not to deliver. The railroad company had a verdict and judgment, and Neimeyer & Co. have filed here a petition in error to review the same.

1. Neimeyer & Co. contend that by virtue of the contract existing between them and Simpson & Co. the delivery of the 17 cars of lumber shipped to Deitz was to take place at Omaha, Nebraska, and that until the lumber reached that place the title thereto remained in Neimeyer & Co., and that the railroad company, all the time it had such lumber in its possession, held it as the agent and bailee of Neimeyer & Co. A vendor's title to property sold by him is divested on its delivery to his vendee, and immediately upon such delivery the title to the property vests in the vendee; but where delivery of property sold is to take place is, of course, to be determined by the contract between the vendor and vendee; and if the contract between the parties expressly provides that delivery shall be made at a certain place, then the vendor's title to the property is not divested until delivery is made at such place. But the universal holding of the courts is that where the contract between the vendor and vendee is silent upon the subject of the place of delivery, the delivery of the property by the vendor to a carrier, for transportation to the vendee, of itself then and there divests the vendor's title to the property, and the vendee's title to such property, from the moment of such delivery to the carrier, attaches. (21 Am. & Eng. Ency. Law 528-530; Benjamin, Sales [2d ed.] secs. 181, 682; 2 Chitty, Contracts [11th Am. ed.] 1201; *Smith v. Gillett*, 50 Ill. 290; *Krulder v. Ellison*, 47 N. Y. 36, and cases there cited; *McKee v. Bainter*, 52 Neb. 604; *Congdon v. Kendall*, 53 Neb. 282.) In such case the carrier is, in contemplation of law, the bailee of the person to whom and not by whom

the goods are sent.   Keeping in view these principles we now proceed to an examination of the contract existing between Neimeyer & Co. and Simpson & Co., which resulted in the former selling to the latter the 17 car loads of lumber involved in this controversy.   The contract existing between these parties is found in certain letters which passed between them.   It would seem that prior to January 8, 1892, Neimeyer & Co. had sent out to the lumber dealers of the country statements showing the various kinds of lumber which they manufactured and had for sale, and it was prior to this date that Deitz had ordered of Simpson & Co. the bill of lumber which the latter did not have on hand.   On this date, January 8, 1892, Simpson & Co. wrote Neimeyer & Co., saying: "We received your stock sheet sometime since, and herewith send you two orders, which you will find very nice ones. Please name your, figures as low as possible on these orders. *   *   *   Also inclose us your lowest f. o. b. price list."   Accompanying this letter were. the two orders mentioned therein.   These orders, so far as material here, were as follows: "A. J. Neimeyer Lumber Company, Waldo, Ark.: Ship to C. N. Deitz, Omaha, Nebraska, *   *   *  17 cars of certain described lumber.   If for any reason you cannot ship, promptly advise.   Please also send bill of lading and invoice to us at Dallas."   Neimeyer & Co. at once filled the order of Simpson & Co. by shipping the 17 car loads of lumber as already stated to Deitz and on January 9, 1892, wrote to Simpson & Co. as follows: "Your valued order of January 8 received and filed for prompt shipment, with the exception of two items.   *   *   *   We have filled your order as follows: [Here follow the description and price of the lumber in the 17 cars.]   Prices f. o. b. Omaha, Nebraska."   It is to be observed that in the correspondence between Simpson & Co. and Neimeyer & Co. the question of the place of delivery of this lumber was not inquired about nor discussed.   The place of the delivery of the lumber was not the subject of the negotiations.   The expression in the

Neimeyer & Co. letter of January 9, "Prices f. o. b. Omaha, Nebraska," they insist affords conclusive evidence that the intention of the parties was that the delivery of this lumber to Simpson & Co. should take place at Omaha, Nebraska. Three witnesses testified on the trial as to the meaning among railroad men and shippers of the expression, "Prices f. o. b. Omaha, Nebraska." One of them said it meant "that the price named in the shipper's invoice is the price at Omaha." Another said it meant "to be delivered at Omaha free on board cars." Neimeyer himself, president of Neimeyer & Co., testified: "If we say f. o. b. Omaha, that means that is the price delivered at Omaha." We think the true construction of the contract is the one placed thereon by the district court, and is in line with the explanation of the phrase in the contract under consideration made by the first and last of the witnesses just named. The word "prices" which precedes "f. o. b. Omaha, Nebraska," is of importance in the construction of this contract. By that expression Neimeyer & Co. meant that the prices which they had affixed to the lumber sold Simpson & Co. were to be the prices which the lumber should cost Simpson & Co. at Omaha; not that the delivery of the lumber to Simpson & Co. should take place at Omaha, but that the price charged Simpson & Co. by Neimeyer & Co. for the lumber was to be its price at Omaha; in other words, that Neimeyer & Co. should pay the freight on this lumber from Waldo, Arkansas, to Omaha, Nebraska; or, what is the same thing, that Simpson & Co., or their vendee, Deitz, might pay the freight and then remit the purchase price of the lumber less the freight. But the fact that Neimeyer & Co. agreed to pay the freight on this lumber from its place of shipment to its place of destination does not afford conclusive evidence that the delivery of the lumber was to take place at Omaha, Nebraska. To summarize: The contract between Neimeyer & Co. and Simpson & Co. was this: Neimeyer & Co. sold them 17 car loads of lumber at the price of $—— at

Omaha—not the delivery at Omaha but the price at Omaha; and Simpson & Co., by their letter of January 8, when asking Neimeyer & Co. to inclose "us your lowest f. o. b. price list," were seeking to ascertain from Neimeyer & Co. what the lumber would cost them, Simpson & Co., at Omaha; and when Neimeyer & Co. answered that letter and shipped the goods and said, "Prices f. o. b. Omaha, Nebraska," they meant to inform, and did inform, Simpson & Co. what the lumber would cost them in Omaha, Nebraska. The contract then between the parties, as evidenced by their correspondence, does not provide that the delivery of this lumber should take place at Omaha. To give that construction to the contract the expression, "prices f. o. b. Omaha," would have to read "delivery f. o. b. Omaha." To give the contract this effect would be to put a violent and unnatural construction upon the language used.

We have been referred by counsel for plaintiffs in error to several cases, which, he insists, sustain his construction of this contract. We have carefully examined all these cases, and not one of them, we think, is in point here, and we confidently say that no decision of any court can be found which has construed "prices free on board" at a named place as equivalent to "delivery free on board" at such place. Among the cases cited by counsel for plaintiffs in error are the following: *Gates v. Chicago, B. & Q. R. Co.*, 42 Neb. 379. But this case has no bearing whatever on the question under consideration here. It simply holds that a carrier makes delivery of goods to a consignee thereof at its peril unless at the time of delivery the bill of lading be surrendered. To the same effect is *Union P. R. Co. v. Johnson*, 45 Neb. 57. And in *Shellenberger v. Fremont, E. & M. V. R. Co.*, 45 Neb. 487, the title to the goods sold never passed to the vendee, as he procured their delivery to him by fraud.

*Stock v. Inglis*, 12 L. R. Q. B. Div. [Eng.] 564, so far as the same bears upon the question under discussion here, is an authority against the contention of plaintiffs in

error. In that case a merchant ordered 200 tons of sugar. The vendor shipped 400 tons of sugar consigned to the city where the purchaser lived. The goods were lost at sea. After the vessel left its wharf the seller sent invoices of 200 tons of this sugar to the vendee, who, upon its receipt, paid the price of the 200 tons of sugar and obtained the bill of lading for the same. The sugar was insured, and the vendee sued the insurance company for the value of the 200 tons of sugar lost. The insurance company claimed that the title to this 200 tons of sugar never vested in the vendee, because that specific amount of sugar was not set apart and delivered by the vendor to the carrier for the vendee, and that, therefore, he had no insurable interest in the sugar lost. But the court ruled that the action of the seller, after the ship left its wharf, in sending to the vendee an invoice for 200 tons of the 400 tons shipped, was a delivery of 200 of the 400 tons of sugar shipped to the vendee at the time of its shipment. This case rests upon the principle that whether the vendor delivered to the vendee 200 tons of the sugar shipped at the time of the shipment was a question of intention to be gathered from the vendor's conduct, and that his making out an invoice of the 200 tons and transmitting it to the vendee, after the ship sailed, evinced his intention of vesting the title of 200 tons of the sugar in the vendee at the time the whole cargo was put on shipboard.

Another case cited by plaintiffs in error is *Miller v. Seamans*, 35 Atl. Rep. [Pa.] 134. The contract in that case was made in February, 1894, between Miller, of Elmira, New York, and Seamans & Co., of Williamsport, Pennsylvania, and by the contract Miller agreed to sell to Seamans & Co. 406,000 feet of hemlock lumber belonging to Miller and then piled in the lumber yard of the Dent Lumber Company at Du Boistown, Pennsylvania, at a price of $8.25 per thousand shipping count f. o. b. cars Williamsport. The lumber was to be loaded, inspected, and measured as ordered by the purchasers.

After a quantity of this lumber had been shipped and delivered to Seamans & Co. a flood occurred and washed away the part of the lumber which had not been shipped, and Miller sought to recover the purchase price of the lumber washed away from Seamans & Co. upon the theory that he had delivered the 406,000 feet of lumber to them on the date of the contract of sale. But the court held "that title did not pass until measurement, inspection, and actual shipment," and then only as to the amount shipped; and that plaintiff, Miller, had to bear the loss of such part of the lumber as not having been measured, inspected, and shipped was carried away by the flood. But this case is not an authority for the contention of the plaintiffs in error here. It is not a decision that "Prices f. o. b. Omaha" is equivalent to "delivery f. o. b. Omaha." The principle upon which the case rests and was decided is that the contract of sale was an executory one and that no title to the lumber agreed to be sold passed to the vendee until the lumber was measured and inspected.

The argument of plaintiffs in error that delivery was to take place in Omaha because, in answer to an inquiry of their vendees, the plaintiffs in error named the price of the goods at that point is not sustained by any authority that I have been able to find. On the other hand the cases in which the question has been presented are against the contention of plaintiffs in error. One of these cases is *Star Glass Co. v. Longley*, 64 Ga. 576. In that case it was held that if the seller, upon inquiry, priced goods to the buyer and thereupon the buyer ordered at that price and the seller delivered the goods to a common carrier consigned to the buyer there was a complete sale at the price named. In *Mee v. McNider*, 109 N. Y. 500, the vendor resided in London, and the vendee in the city of New York. By the contract between the parties the vendor sold to the vendee 500 bags of cocoa at fifty-nine shillings per hundred weight. These fifty-nine shillings per hundred weight, by the terms of the contract, were

"to include cost, freight, and insurance;" and it was held that the title of the vendee to the cocoa vested upon its delivery on board ship for transit to New York. There is no difference in principle between this case and the one at bar, so far as regards the terms of the contract under consideration. Here the vendors agree to sell the vendees lumber for so many dollars, and this price includes the freight from the place of shipment to the lumber's destination, and by the contract the bills of lading are to be sent by the vendors to the vendees, Simpson & Co.

Thus far we have considered whether it was the mutual intention of the parties that the title to the lumber sold should vest in the vendees only upon its arrival and delivery at Omaha; and the contract—the correspondence —between the parties does not afford evidence that such was their intention, but rather that the thing specially negotiated about between the parties was the price of the lumber, and the contract does not afford evidence that the parties did intend that the delivery of the lumber should take place at Omaha, but left the delivery to take place in the ordinary manner of the delivery of goods by a vendor when ordered by a distant vendee. But, notwithstanding the sale of this lumber by Neimeyer & Co. and its delivery to a carrier consigned to their vendee, Neimeyer & Co. might have exercised the *jus disponendi*, as it is called in the text-books, over the property sold; that is, Neimeyer & Co. might have retained the title to the lumber shipped, and by exercising this right made the carrier of this lumber their bailee. (1 Schouler, Personal Property [3d ed.] sec. 271, and cases there cited.) The claim of the plaintiffs in error here is that they did exercise this *jus disponendi*, and that notwithstanding they sold the lumber to Simpson & Co., and at their request consigned it to Deitz, they retained the title and the carrier held it as their bailee. We know what Neimeyer & Co. did, and the question before us now is whether their conduct in the premises authorizes an inference that notwithstanding the sale and the shipment of these goods

they intended to retain title until their arrival in Omaha. Their intention must be found in their conduct, and it is that intention that we are now in pursuit of, and for the purpose of ascertaining it it is our duty to follow every trail, however dim and tortuous it may be, which leads in the direction of such intention.   If Neimeyer & Co. at the time of the shipment of these goods intended to reserve in themselves the title thereto until their arrival at Omaha, it must have been because by so reserving the title they desired to make themselves sure of receiving the pay for the goods sold before they should part with them.   Certainly they would not voluntarily, and in the absence of a contract requiring them to do so, reserve the title for the purpose of suffering the loss in case the goods should be destroyed in transit.   But by the contract of sale between Neimeyer & Co. and Simpson & Co. these goods were not sold for cash on delivery but on sixty days' time.   If the goods then had been consigned by Neimeyer & Co. to Simpson & Co. at Dallas, Texas, the fact that they were sold on sixty days' time would afford a presumption that the sellers did not intend at the time they shipped them to reserve title in themselves until they were paid for.   Again, it is to be remembered that Neimeyer & Co. did not sell these goods to Deitz, their consignee, and it is an unreasonable claim on the part of Neimeyer & Co. to say in the face of this record that they sold the goods to Simpson & Co. on sixty days' time and at their request consigned them to Deitz and yet all the time intended to retain the title to these goods.   Are we to understand from the argument of Neimeyer & Co. that they did not intend that these goods should be delivered to Deitz until sixty days from the date of their shipment? At the time Neimeyer & Co. shipped these goods they might have caused themselves to have been made consignees in the bill of lading, and had they done this, then their conduct in so doing would have authorized the presumption that they thereby intended to reserve the title to the goods, and that the carrier held them

as their bailee.    (2 Schouler, Personal Property [3d ed.]
sec. 273, and cases there cited; Usher, Sales of Per-
sonal Property secs. 228, 230, and cases there cited;
Newmark, Sales sec. 147, and cases there cited; R. M.
Benjamin, Principles of Sales 92, where the rule is
thus concisely stated: "Where goods are shipped and
by bill·of lading the goods are delivered to the order of
the seller or his agent, the seller is *prima facie* deemed to
reserve the right of disposal;" *First Nat. Bank of Cairo v.
Crocker*, 111 Mass. 163; *Merchants Nat. Bank of Cincinnati
v. Bangs*, 102 Mass. 291; *Seeligson v. Philbrick*, 30 Fed.
Rep. 600.)    But Neimeyer & Co. at the time they shipped
these goods did not cause them to be consigned to them-
selves, to their agent, or to their order.    On the contrary
they caused these goods to be consigned to Deitz, the
vendee of their vendees, and this fact authorizes the in-
ference that it was then and there the intention of Nei-
meyer & Co. that the title to the goods should pass upon
their delivery to the carrier for transit to their vendees'
vendee.    Upon this subject the cases are all one way.

In Usher, Sales of Personal Property, sec. 232, it is
said: "If the bill of lading, or other written evidence of
the delivery to a carrier, be taken in the name of the
consignee, or be transferred to him by indorsement, this,
if not controlled by other evidence, affords the strongest
proof of the intention of the seller not to retain his hold
on the property after it is taken by the carrier as security
for payment of the price."

In Newmark, Sales, sec. 152, it is said: "For it has been
declared to be perfectly well settled that if a consignor
in such a case wishes to prevent the property in the
goods, and the right to deal with the goods while at sea,
from passing to the consignee, he must by bill of lading
make the goods deliverable to his own order, and forward
the bill of lading to an agent of his own.    And if he does
not do that, though he still retains the right of stopping
the goods *in transitu*, yet, subject to that right, the prop-
erty in the goods and the right to the possession of the
goods is in the consignee."

In 2 Schouler, Personal Property [3d ed.] sec. 264, it is said: "Delivery is a circumstance often considered in connection with the appropriation of specific chattels under a contract. It is doubtless well established as the rule both of England and America that where—all other things being equal—a seller delivers goods to the buyer or to a carrier by order of the buyer, the appropriation is determined beyond his power to recall it, for the property has thus presumably vested in the buyer. This rule, however, is subject to the principle of *jus disponendi*. * * * But the delivery of goods to the buyer or his agent, or to some carrier for him, is a palpable act of appropriation and tender by the seller, whose intent thus evinced to transfer the title absolutely to the buyer can hardly be disputed, if the bill of lading be taken out in the consignee's name, or indorsed over to him without restriction." And the same author in section 273 uses this language: "Now supposing the seller, in sending goods by a vessel, or other carrier, to have taken out a bill of lading or similar document, a new circumstance is presented. The rule of presumption becomes this: That the carrier thereby agrees to take the goods as bailee for the person whose name is therein indicated as the one for whom the goods are to be carried; and this bill being made out to the seller or order, the carrier's engagement is *prima facie* to carry the goods for and on account of the seller, to be delivered to him in case it should not be assigned or indorsed. * * * On the other hand, taking out the bill of lading in the buyer's name affords presumptive evidence on the seller's part of an intent to transfer the title."

In *Emery v. Irving Nat. Bank*, 25 O. St. 360, it was said: "If the consignment be made by a vendor to a vendee, the question whether the consignor reserved the *jus disponendi* is one of intention to be gathered from all the facts and circumstances of the transaction. * * * On such question of intention the terms of the bill of lading are to be taken as admissions of the consignor, and are

entitled to great weight, but are not conclusive." To the
same effect are *Straus v. Wessel,* 30 O. St. 211; *Ranney v.
Higby,* 5 Wis. 62; *Finch v. Mansfield,* 97 Mass. 89; *Kline v.
Baker,* 99 Mass. 253; *Stanton v. Eager,* 33 Mass. 467; *Prince
v. Boston & L. R. Co.,* 101 Mass. 542; *Halliday v. Hamilton,*
78 U. S. 560; *Merchants Exchange Bank of Milwaukee v.
McGraw,* 76 Fed. Rep. 930; *Webb v. Winter,* 1 Cal. 417;
*Putman v. Tillotson,* 13 Met. [Mass.] 517; *Grove v. Brien,*
49 U. S. 429; *Glidden v. Lucas,* 7 Cal. 26; *Hope Lumber Co.
v. Foster,* 53 Ark. 196; *Robinson v. Pogue,* 86 Ala. 257.

A. J. Neimeyer, the president of Neimeyer & Co., tes-
tified on the trial of this case, and on the subject of the
delivery of the lumber—that is, whether its delivery to
his vendees, Simpson & Co., was to take place at Omaha
or at the place of shipment—said:

Q. Who were you looking to for the payment of this
[lumber]?

A. When the delivery was made, when we commenced
shipping, we looked to Simpson & Perkins, of course.

Q. Did you consider when you had delivered to the
railroad company you had complied with the terms of the
agreement between you and Simpson under which you
sold?

A. We would——

Q. I ask you the simple question, did you not consider
when you delivered this lumber to the railroad company
at Waldo you had fully performed your contract with
Simpson & Co.?

A. As far as delivering the lumber was concerned.

Here then is the president of the plaintiffs in error ad-
mitting on oath that he understood he had complied with
his contract with Simpson & Co. when he delivered the
lumber they ordered on board the cars at the place of its
shipment. In other words, he admits that it was his inten-
tion that delivery of this lumber to Simpson & Co. should
take place when it was put on board the cars at Waldo.
Thus far no act of Neimeyer & Co. in the sale and ship-
ment of this lumber evinces an intention on their part to

retain title to the lumber in themselves until its arrival at Omaha; but their every act authorizes the presumption that they never entertained such an intention, but, on the contrary, intended the delivery of the goods to take place in the usual and ordinary manner of delivery of goods ordered by a party at a distance, namely, by a delivery to a carrier for transit to such a buyer. But by the contract between Neimeyer & Co. and Simpson & Co. the former were to pay the freight on this lumber from its place of shipment to Omaha, and it is insisted that this fact overturns all the other presumptions which Neimeyer & Co.'s conduct raised against them that the title did pass on delivery to the carrier at Waldo, and affords conclusive evidence that they retained the title in the goods shipped and that the carrier held them as their bailee. We have been cited to no case, nor do we think one can be found, which holds that the payment of freight by a vendor is conclusive evidence that he thereby intended to retain the title in the goods, or that the delivery of the goods was to take place not at their point of shipment but at their destination. It is not doubted that a vendor might by express contract agree to deliver goods at their place of destination and that this contract would control; but it is not claimed that any such express contract exists here. The claim here is that because the vendors paid the freight, this fact is conclusive evidence that they retained the title. It may be safely conceded that the payment of freight by the vendors is a circumstance which affords some evidence that the vendors intended to retain the *jus disponendi* of the goods shipped, but it is not conclusive; and there is no case, we repeat, which holds that it is, unless it be a case in Illinois, to be presently noticed. The cases, and all the cases upon the subject, are to the effect that the payment of the freight by the vendor is evidence of an intention upon his part to retain title in the goods. (See the rule stated and the authorities cited in Benjamin, Principles of Sales 87.)

In *Devine v. Edwards*, 101 Ill. 138, it is said in the syl-

labus: "Where a contract for the sale and delivery of personalty * * * expressly provides that it is to be shipped by the seller to the place of business of the purchaser at the expense of the seller, the place of delivery is the business place of the purchaser, and any loss on the way must fall upon the seller." In that case a seller of milk lived at Dundee, Illinois, and the purchaser lived at Chicago. The seller sued the purchaser to recover for the price of milk which he claimed to have sold and delivered to him. The seller interposed as a defense to the action a set-off based on this state of facts: He claimed that he had been buying milk from the plaintiff for some five years; that the milk was shipped in what both parties supposed to be eight-gallon cans, but that, as a matter of fact, the cans did not hold eight gallons; that in consequence of the mistake as to the capacity of the cans he had overpaid the milk seller. On the trial the district court refused to give to the jury the following instruction: "The jury are instructed that if they believe from the evidence that during the five years immediately prior to the commencement of this suit the defendant purchased milk of the plaintiff by the gallon, to be shipped from Dundee to Chicago, and that the plaintiff agreed to pay the freight on such milk, and that nothing was said by either the plaintiff or defendant in regard to the place of delivery, then the law makes Chicago the place of delivery." The supreme court held that this instruction should have been given, thus ruling in fact that the payment of freight by the seller of the milk made the place of delivery, Chicago, the destination of the milk. We are unable to see how the place of the delivery of this milk was material in that action, as the only two questions litigated were (1) a question of fact as to whether the milk cans were short in capacity, and (2) a question of law if the cans were deficient in capacity whether the purchaser could set off overpayments against what he was owing. The court in support of its decision cites *Dunlop v. Lambert*, 6 Cl. & F. [Eng.] 600. But in that case the

seller of the property did not pay the freight. The vendee paid it, and the case, therefore, is not authority for the conclusion reached by the supreme court of Illinois. Furthermore, if the Illinois case is to be regarded as holding that the payment of freight by the vendor is conclusive evidence that he retained title to the goods shipped while in transit, or, in other words, that such payment of the freight made the delivery take place at the destination of the goods, then the case stands alone.

A case exactly in point here and against the contention of plaintiffs in error is *Tregelles v. Sewell*, 7 H. & N. [Eng.] 573. In that case the plaintiff sold "three hundred tons of Old Bridge iron rails at 5*l.* 14*s.* 6*d.* per ton, to be delivered at Harburg, cost, freight, and insurance." Payment was to be made for the rails in London, less the freight, upon delivery to the purchaser of the bill of lading for the rails and a policy of insurance, and it was held that the true construction of the contract was that the vendor was not to make delivery of the rails at Harburg, but only to ship them to that place at his own cost free of any charge to the vendee, and that the property in the rails passed to the vendee on the delivery to him of the carrier's bill of lading and the policy of insurance.

In *Dawes v. Peck*, 8 Term Rep. [Eng.] 330, it was ruled: "If the consignor of goods deliver them to a particular carrier by order of the consignee and they be afterwards lost, the consignor cannot maintain an action against the carrier for the loss, although he paid for booking the goods."

In *King v. Meredith*, 2 Camp. [Eng.] 639, the vendor sold a quantity of brandy and wine and delivered it to a carrier to be conveyed to the vendee, the vendor paying the freight. The goods never reached the vendee. His defense was that the title to the goods remained in the vendor, and that this was evidenced by the fact that he paid the freight. But the court said: "As soon as goods are delivered to a carrier, they are at the risk of the purchaser, although the carrier be paid by the vendor."

26

In *McLaughlin v. Marston*, 47 N. W. Rep. [Wis.] 1058, it was ruled that where a customer has a continuing contract with a wholesale merchant to ship on order coffee, freight prepaid, and during the continuance of such contract gives a written order to "ship at once ten cases of coffee," which is done, the seller prepaying the freight, and five cases of the coffee are attached by a creditor of the purchaser before delivery to him by the carrier, it is a question for the jury whether the coffee was to be delivered by the seller at the purchaser's place of business or to the carrier only.

In *Havens v. Grand Island Light & Fuel Co.*, 41 Neb. 153, the vendor sold to his vendee "coal at $9.85 per ton f. o. b. Grand Island," and it was in effect held that the fact the price at Grand Island included freight —that is, the vendor paid freight—was a circumstance affording some evidence that the coal was to be delivered at Grand Island. But the case does not hold that the vendor's paying freight is conclusive evidence of delivery at destination.

*Wagner v. Breed*, 29 Neb. 720, is, however, decisive of the question under consideration and against the contention of the plaintiffs in error. In that case Wagner was a wholesale dealer in beer and resided in Rock Island, Illinois. Breed was a dealer in beer in Hastings, Nebraska. Wagner sold and shipped to Breed large quantities of beer and paid the freight from Rock Island to Hastings. He took Breed's note, secured by mortgage, for the beer furnished him, and this suit was brought to foreclose that mortgage. Breed defended the action upon the ground that Wagner had no license to sell intoxicating liquors in the state of Nebraska; that the consideration for the note in suit was beer sold and delivered by him, Wagner, to him, Breed, and that the delivery took place at Hastings, Nebraska, and that, therefore, Wagner could not enforce the note and mortgage; and the district court ruled that the delivery of the beer furnished by Wagner to Breed took place in Hastings, Nebraska,

that the note and mortgage were unenforceable, and dismissed Wagner's action. On appeal to this court the decree of the district court was reversed, this court holding that notwithstanding the fact that Wagner paid the freight on the beer from Rock Island, Illinois, to Hastings, Nebraska, the delivery of the beer took place in Rock Island, Illinois. In this case the only evidence on the subject that the delivery of the beer took place in Hastings was the fact that Wagner paid the freight thereon. This case then is a solemn adjudication of this court that the mere fact that a vendor pays the freight is of itself not sufficient evidence to overthrow the presumption that where a purchaser orders goods from a distant seller and he in pursuance of the order delivers the goods to a carrier for shipment to the vendee, such delivery is a delivery to the vendee, and that his title at once attaches. To the same effect is *Mee v. McNider*, 109 N. Y. 500.

Conceding then that Neimeyer & Co.'s paying the freight on the lumber in controversy raises the presumption that they retained title to the lumber while it was in transit, and that its delivery was to take place at Omaha, we think the district court was right in holding that the effect of this presumption was destroyed by the other evidence in the case. Whether the delivery of this lumber took place at Waldo or Omaha was a question of fact for the trial court sitting without a jury; that fact was to be determined from the intention of the vendors; and this intention was to be ascertained from all the facts and circumstances in evidence in the case. But when the district court came to weigh and consider the conduct of the vendors, it had before it a sale and shipment made by vendors in the ordinary manner of goods ordered by a distant buyer, the contract specially referring only to quality, quantity, and price of the goods; the contract containing nothing in reference to the place where the goods were to be delivered; the sale made by vendors, and goods shipped to the vendees; a sale made on sixty

days' time, the vendors taking a bill of lading from the initial carrier in which neither they nor their agents were named as consignees of the goods, and which by their contract was to be sent to their vendees, Simpson & Co., and in which bill of lading the vendees were named as consignees; the evidence of the plaintiffs in error that, in so far as delivery of the lumber was concerned, they understood that they had complied with their contract with Simpson & Co. when they delivered the lumber to a carrier at Waldo for transit to their vendees, and that the lumber was sold to Simpson & Co. and the sellers looked to them to pay for it. From these facts, and each one of them, the law raised the presumption that the delivery of the goods took place and the title vested in the vendees when the goods were delivered to the initial carrier. Against all these presumptions stood, and stands, singly, the fact that the vendors paid the freight. The district court was of opinion—and in that opinion we entirely concur—that the presumption that the title remained in the vendors because they paid the freight was overthrown by the other facts in evidence in the case and the presumptions which flowed therefrom.

2. This brings us to the consideration of the question of Neimeyer & Co.'s right to stop these goods *in transitu* because of the insolvency of their vendees, Simpson & Co. In order that a vendor may exercise the right of stoppage *in transitu* of goods sold they must at the time be in the possession of some person intervening between the vendor who has parted with and the purchaser who has not yet received them; that is, they must be in transit from the vendor to his immediate vendee. In the case at bar we have already seen that Neimeyer & Co., the vendors of these goods, delivered them at Waldo, Arkansas, to their vendees, Simpson & Co., and when the goods left Waldo, Arkansas, for Omaha, Nebraska, they were in transit, not from their original vendors, Neimeyer & Co., to their original vendees, Simpson & Co., but from Simpson & Co., who had become vendors of the goods, to their

vendee, Deitz. The sale of these goods by Neimeyer & Co. to Simpson & Co. and their delivery to the latter at Waldo consigned to Simpson & Co.'s vendee, Deitz, was, in effect, the same as if Neimeyer & Co., after selling the goods, had shipped and delivered them to Simpson & Co. at Dallas, Texas, and they had then sold and shipped them to Deitz. So the question is: May a vendor of goods exercise the right of stoppage *in transitu* after they have been received and sold by his immediate vendee and are *in transitu* to that vendee's vendee? We think that all the authorities answer this question in the negative.

In Jones, Liens sec. 870, it is said: "The right [to stop goods *in transitu*] can be exercised only by one who holds the relation of vendor to the consignee. If one buys goods and directs his vendor to consign them to a customer of his own with whom the vendor has no privity, and the vendor accordingly ships the goods to such third person, he cannot stop them *in transitu* to him upon the insolvency of his immediate purchaser."

A case precisely in point here is *Memphis & L. R. R. Co. v. Freed*, 38 Ark. 614, 9 Am. & Eng. R. Cas. 212. In that case Freed was a merchant at Dardanelle and ordered of Walker Bros. & Co., at St. Louis, a bill of goods. The latter transmitted the order to Lehman & Co. at New Orleans with directions to ship the goods to Freed and send the invoice and bill of lading to them, Walker Bros. This was all done. While the goods were *in transitu* from New Orleans to Freed, Walker Bros. & Co. failed and Lehman & Co., claiming to exercise the right of stoppage *in transitu*, demanded and received from the carrier the goods. Freed then sued the railway company for the value of the goods, claiming that he was the vendee of Walker Bros. & Co. and not the vendee of Lehman & Co., but merely their consignee, and that there was no privity of contract between him and Lehman & Co., and, therefore, as against him, they had no right to stop the goods in transit; and the court held the railway company liable to Freed for the value of the goods. To the same effect

are *Rowley v. Bigelow*, 29 Mass. 306; *Eaton v. Cook*, 32 Vt. 58; *Noble v. Adams*, 7 Taunt. [Eng.] 59.

We think, therefore, that the insolvency of Simpson & Co. did not invest Neimeyer & Co. with the right to stop these goods in transit nor render the railway company liable to Neimeyer & Co. for delivering them to Deitz, the consignee thereof, since Deitz was not the vendee of Neimeyer & Co., but their consignee merely. He was the vendee of Simpson & Co. The only transit of these goods that took place as between Neimeyer & Co. and Simpson & Co. was the transit that occurred of the goods between the lumber yard in Waldo, Arkansas, and the railway cars at that station, and when the goods were delivered to the carrier there and billed to Deitz it was the same as a sale and delivery of the goods at that place to Simpson & Co. and a resale and redelivery of the goods there by Simpson & Co. to Deitz.

3. But it is insisted by counsel for the plaintiffs in error that this judgment must be reversed because of the condition of the pleadings. This we will now proceed to notice. Neimeyer & Co. in their petition alleged: "That on or about the 8th day of January, 1892, the plaintiff agreed to sell unto Simpson, Perkins & Co., of Dallas, Texas, 17 car loads of lumber of the plaintiff's manufacture at its mills in Waldo, Arkansas, to be delivered at Omaha, Nebraska, free of freight on board the cars at Omaha, Nebraska, for the sum of $3,432.96, less the freight from Waldo, Arkansas, to Omaha, Nebraska." The railroad company answering this allegation of the petition used the following language: "It admits that the plaintiff agreed to, and did on the date stated, sell to Simpson & Co., of Dallas, Texas, 17 car loads of lumber as therein alleged." Now it is said by the plaintiffs in error that the railroad company by this answer has admitted that the delivery of the lumber in controversy was to take place in Omaha, Nebraska. If the foregoing quotation from the pleadings was all they contained upon the subject, we should feel obliged to reverse this case because of this

admission in the answer; but the answer of the railroad company, in addition to the admission just quoted, sets out the contract between Simpson & Co. and Neimeyer & Co. in full; and Neimeyer & Co., in their reply to this answer, admit that the contract between them and Simpson & Co. pleaded by the railroad company in its answer is the actual contract made between those parties. Neimeyer & Co., by their reply, have admitted that the contract existing between them and Simpson & Co. was not the contract which they pleaded in their petition, but the contract set up in the railroad company's answer; and the question litigated in the district court was as to the proper construction of the contract pleaded in the answer and admitted to be the contract by reply. Under these circumstances we do not think this judgment should be reversed because of the admission made by the railroad company in its answer. The judgment of the district court is right and is

AFFIRMED.

HARRISON, C. J., SULLIVAN, J., IRVINE and RYAN, CC.

We concur in the conclusion reached by Commissioner RAGAN on the ground that, conceding for the purpose of this case that the use of the expression "Prices f. o. b. Omaha" might of itself afford a presumption that the delivery was to be made at Omaha and that title should there pass, the other evidential facts were sufficient to ground an inference that title should pass at the place of shipment, and the question being one of fact the finding is sustained by the evidence.

NORVAL, J., dissenting.

I do not concur in the judgment just rendered. There is no controversy as to the material facts. Simpson, Perkins & Co. were wholesale dealers in lumber at Dallas, Texas, from whom C. N. Deitz, without plaintiff's knowledge, before January 8, 1892, ordered 20 cars of lum-

ber to be delivered to himself at Omaha. Simpson, Perkins & Co. thereupon sent a letter, inclosing order for the 20 cars of lumber, to the plaintiff, the A. J. Neimeyer Lumber Company, at Waldo, Arkansas. The letter is as follows:

"DALLAS, TEXAS, Jan. 8, 1892.

"*A. J. Neimeyer Lumber Company, Waldo, Ark.*—GENTLEMEN: We received your stock sheet some time since, and herewith send you two orders, which you will find are very nice ones. Please name your figures as low as possible on these orders. Kindly advise us how you are fixed for clear flooring and finished stuff, and we may hand you some orders at an early date. Also inclose us your lowest f. o. b. price list.

"Yours very truly, SIMPSON, PERKINS & Co."

The orders inclosed in said letter were alike, except as to number of cars and kind of lumber, and read as follows:

"DALLAS, TEXAS, Jan. 8, 1892.

"*A. J. Neimeyer Lumber Co., Waldo, Ark.:* Ship to C. N. Deitz, Omaha, Neb., via —— R. R., care —— R. R., rate 22 [Here follow the number of cars and description of lumber required.], as soon as you can. If for any reason you cannot ship promptly, advise. Please always send bill of lading and invoice to us at Dallas.

"Yours truly, SIMPSON, PERKINS & Co."

On January 9, 1892, plaintiff sent the following reply:

"A. J. NEIMEYER LUMBER COMPANY,
"MILLS, WALDO, ARK.

"ST. LOUIS, Jan. 9, 1892.

"*Messrs. Simpson, Perkins & Co., Dallas, Texas*—GENTLEMEN: Your valued orders of January 8th received and filed for prompt shipment, with the exception of two items. The 2x4—20ft. and the 2x12—20 we have not now in stock. We have filled orders as follows:

One car 2x10—12, No. 1 Common S. 1 S. 1 E ....... $13.00
   "  2x10—14,  "    "    "  "  ...... 13.00
   "  2x10—16,  "    "  .  "  "  ...... 13.00
   "  2x10—18,  "    "    "  "  ...... 14.00
   "  2x10—20,  "    "    "  "  ...... 14.00
   "  2x12—12,  "    "    "  "  ...... 13.25
   "  2x12—14,  "    "    "  "  ...... 13.25
   "  2x12—16,  "    "    "  "  ...... 13.25
   "  2x12—18,  "    "    "  "  ...... 14.25

"Prices f. o. b. Omaha, Nebraska.   Also,

Two cars 2x4—12, No. 1 Common S. 1 S. 1 E ...... $13.00
   "  2x4—14,  "    "    "  "  ...... 13.00
   "  2x4—16,  "    "    "  "  ...... 13 00
   "  2x4—18,  "    "    "  "  ...... 14.00

"Prices f. o. b. Omaha, Nebraska.

"Also on flooring we beg to name you price, f. o. b., Waldo, Ark., $15.30; on finished lumber S. 2 S., 1x4, and 1st and 2d, $15.30; 1x8, 10 and 12, 1st and 2d, $16.80; 1¼x8, 10 and 12, 1st and 2d, $19.80; 1½x8, 10 and 12, 1st and 2d, $20.80; 2x6—8, 10 and 12, 1st and 2d, $21.80. 1-inch Star Finish, $3 less than 1st and 2d; 1¼, 1½, and 2-inch Star Finish, $4 less than 1st and 2d clear.

"Trusting that these figures will be satisfactory to you, assuring you that our material is well manufactured, and we feel confident we can please you, we solicit your trade in our line.   Awaiting your further commands, and thanking you for the orders, we remain yours truly,

"A. J. NEIMEYER LUMBER CO.,<br>"By E. B. ECKHARD."

Plaintiff, in compliance with the contract contained in the foregoing letters, sold to Simpson, Perkins & Co. 17 of the 20 cars of lumber so ordered, and shipped the same from Waldo, Arkansas, consigned to C. N. Deitz at Omaha on different dates between January 15, 1892, and January 21, the same year.   The cars of lumber were delivered for shipment to the St. Louis & Southwestern Railway Company at Waldo, Arkansas, by which company they were delivered to a connecting carrier, and by

the latter delivered to the defendant company to be transported to Omaha, this state, for delivery to the consignee, Deitz. Invoices of the lumber were made by plaintiff and sent to Simpson, Perkins & Co., Dallas, Texas. After the delivery of the cars for shipment, and before they had reached their destination, Simpson, Perkins & Co. failed, without having paid for the lumber. Thereupon plaintiff notified the initial carrier to stop delivery of the cars to Deitz, and the defendant likewise received similar notice after a portion of the lumber had been received by the consignee, but before at least 11 cars had reached their destination. Plaintiff demanded from defendant that the remaining cars of lumber be delivered to it, with which request the company refused to comply, but delivered the same to Deitz. Thereupon this suit was brought for the value of the lumber, less freight. The bills of lading were issued by the initial carrier to plaintiff, which were retained by the latter and were never sent, or delivered, to either the consignee or to Simpson, Perkins & Co. The shipments already mentioned constituted the only transactions between said firm and plaintiff. The latter knew nothing about any deal between Simpson, Perkins & Co. and Deitz, and had no knowledge as to how or why the lumber was to be sent to Deitz, except that the orders so directed the shipping to be made.

A. J. Neimeyer, president and manager of plaintiff's company, testified on direct examination concerning the meaning of the words "Prices f. o. b. Omaha," as used in the correspondence above set out, that "the initials f. o. b. have a well understood meaning among railroad men and shippers. They mean free on board at the point of delivery. If we say f. o. b. Omaha, that means that is the price delivered at Omaha." The witness on cross-examination further testified:

Q. Now, this f. o. b. means simply the price at the place named, does it not?

A. We agree to deliver the lumber at that price at the point of destination,

Q. Do you agree to ship the lumber to the consignee at your own risk?

A. Yes, sir.

Q. You assume the risk?

A. We assume the risk. If there is any damage in transit, we look to the railroad company.

Q. That is your understanding of those terms?

A. Yes, sir.

Q. Isn't it your understanding, Mr. Neimeyer, that f. o. b. simply means the price to the consignee, or the purchaser at a certain place?

A. No, sir.

Q. It is a form of expression of where the delivery shall be made, is that your understanding?

A. That is our understanding; and the price of course attached to it.

Q. Don't you know as a matter of fact that in railroad parlance the term f. o. b. has no reference to the question of delivery, but purely to the question of price?

A. In railroad parlance.

Q. And in business parlance?

A. We do not consider it so.

Q. What does the general public consider it?

A. Men in similar business do not consider it so either.

* * *

Q. I ask you the simple question, did you not consider when you delivered to the railroad company at Waldo, you had fully performed your contract with Perkins, Simpson & Co.?

A. As far as delivering of the lumber was concerned.

Q. Whatever the contract was?

A. We had not fulfilled our contract until we did what we agreed to do.

Q. I want to know—you say you had not—you would not consider you had?

A. No, sir; I would not consider I had.

Q. When would you consider you had fulfilled your contract?

A. When the lumber arrived at its destination all satisfactory.

Q. When it arrived at its destination?

A. Yes, sir.

Q. Then that consideration is based upon what; what terms or writing or expression in the contract do you base the construction?

A. On simply the reason that we agreed to deliver it at Omaha.

Q. What expression?

A. Free on board cars at Omaha.

Q. Then because that letter said f. o. b. at Omaha, 22 cent rate, you interpret it as meaning you had not performed your contract with Simpson, Perkins & Co. until the goods reached Omaha.

A. That would be our interpretation of it.

John A. Sargent, the assistant general freight agent of the Kansas City, Fort Scott & Memphis Railway Company, testified by deposition, *inter alia,* that he had been engaged in railroad business about seven years; knew the meaning of the initial letters "f. o. b." as used in commercial and railroad transactions, and that the expression "f. o. b. at Omaha" means "to be delivered at Omaha free on board cars." The foregoing testimony of the two witnesses named stands uncontradicted in the record.

The chief question presented in this case is, in whom was the title to the lumber while being transported by the carrier to Omaha, the final place of destination? If the title passed from plaintiff upon the delivery of the lumber to the railroad company for carriage at Waldo, Arkansas, as the defendant asserts, then there can be no recovery in this action. Ordinarily, in the absence of an agreement, expressed or implied, to the contrary, personal property is delivered at the place where it is when sold. Where, however, a dieffrent place where it is fixed by the contracting parties, that will govern. In this case there is no claim that the delivery of the lumber was to be made at plaintiff's mills in Waldo, or that the title passed

there.   The correspondence between Simpson, Perkins & Co. and plaintiff, which constitutes the contract of sale, discloses that the lumber was sold and purchased for the purpose of being shipped to Omaha, and that plaintiff was to make delivery elsewhere than at its mills.   The lumber was to be selected by plaintiff and placed on the cars for transportation, and the contract price was a cer tain sum per 1,000 feet, varying according to the kind of lumber, "f. o. b. Omaha."   The authorities unite in stating that the delivery of goods by a seller to a common carrier for conveyance to the buyer, when the transportation is to be made in that manner; and the contract is silent on the subject, is delivery to the purchaser, and *prima facie* the title to the property at once vests in the latter, subject to the exercise of the vendor of the right of stoppage *in transitu*, since the carrier is regarded as bailee or agent of the vendee, and not of the vendor.   But if the contract requires the seller to make delivery at a distant point, the carrier is his bailee or agent, and usually the title does not pass until the property has been delivered at the point designated by the parties.   (*Sneathen v. Grubbs*, 88 Pa. St. 147; *Braddock Glass Co. v. Irwin*, 153 Pa. St. 440; *Hanauer v. Bartels*, 2 Colo. 514; Benjamin, Sales, sec. 1040.)

R. M. Benjamin, in his work on the Principles of Sales, at page 87, states: "If it appear that the seller undertakes to deliver the goods at the place of their destination, assuming the risk of their transmission, the carrier is the bailee of the seller and the property in the goods does not vest in the buyer until they are delivered at such place."   The author, at page 145, in speaking of the general doctrine that the delivery of goods to a carrier by a vendor for the purpose of transportation to the vendee is *prima facie* delivery to the latter, says: "The rule does not obtain when it appears that the seller undertakes to deliver the goods at the place of destination.   In such case the carrier is the agent of the seller."

In Newmark, Sales, sec. 166, the author says: "The

general rule is that title will not pass until delivery, if it is a part of the contract of sale that the seller shall deliver the property sold at some place specified and receive payment on delivery. * * * And that if by the terms of the contract the seller engages to deliver the thing sold at a given place, and there be nothing to show that in the meantime the thing sold was to be at the risk of the buyer, the contract is not fulfilled by the seller unless he delivers it accordingly." (*Bloyd v. Pollock*, 27 W. Va. 75; *Devine v. Edwards*, 101 Ill. 138; *Suit r. Woodhall*, 113 Mass. 391; *Weil v. Golden*, 141 Mass. 364; 21 Am. & Eng. Ency. Law 528-530.)

*McNeal v. Braun*, 53 N. J. Law 617, was an action to recover the contract price of a quantity of coal shipped by plaintiff from Philadelphia to the defendant at Burlington, under a contract fixing the price at $4.10 a ton delivered at Burlington. The coal was shipped in a barge selected by the seller, and reaching in the evening the last named place was moved along side of defendant's wharf for the purpose of unloading. During the night the barge sank, and the coal was lost. The court in the opinion say: "Under a contract of this sort, delivery of the coal on board the barge was delivery to the master as the plaintiff's bailee or agent, to perform for him the act of delivery in execution of his contract. (1 Benjamin, Sales [Corbin's ed.] sec. 556.) Meanwhile, and until delivery was consummated in such manner as to be effectual as between vendor and purchaser, the coal was at the plaintiff's risk. * * * But the plaintiff, instead of being an agent to procure transportation, had himself contracted to deliver the coal, and these instructions ignore the fact that under a contract of that sort the undertaking to deliver is absolute and unqualified, and delivery of the goods is a condition precedent to the right of the vendor to sue for the contract price. If the goods be lost or destroyed before delivery is consummated the vendor must bear the loss. Under such a contract the carrier selected by the vendor is his agent to perform the

contract to deliver, and the vessel in which the goods are carried is *pro hac vice* the vendor's vessel.  For the negligence of the one and the condition of the other, and, indeed, for failure to make the delivery of the coal according to the contract, for any cause not due to the fault of the purchaser, the responsibility is upon the vendor."

*Westman Mercantile Co. v. Park,* 31 Pac. Rep. [Colo.] 945, was to recover the contract price of two cars of hay shipped by plaintiff to defendant at Denver.   It was held the delivery was complete and the title to the hay passed to the buyer, when the cars containing the hay were left in the general receiving yards of the carrier at the final place of destination.

It is argued that the place of delivery of this lumber was on board the cars at Waldo, and that the title passed when the lumber was put on the cars for shipment.   The soundness of this contention depends upon the construction given to the clause in the contract "prices f. o. b. Omaha," as there is no other provision relating to the subject of delivery.   The initial letters "f. o. b." in contracts of sale, when the property is to be transported, mean "free on board" the cars at a designated place, whether that be the initial point of shipment or place of final destination.   They imply that the buyer shall be free from all the expenses and risks attending the delivery of the property at the point named in the contract for such purpose.   This contract should be interpreted precisely the same as if it read "prices free on board cars at Omaha," and the plain and obvious meaning of those words is that plaintiff was required to pay all freight and expenses, assume all risk of transportation, and that the title did not pass from the seller until the lumber arrived at Omaha.   Had the contract named "prices f. o. b. Waldo," then delivery to the carrier at Waldo would have been delivery to the purchasers, and title would at once have passed.   (*Congdon v. Kendall,* 53 Neb. 282.)   But the contract before us reads "f. o. b." place of destination, which is materially different from a

clause which provides for the delivery of property at the initial point of transportation. Had this lumber been lost while in transit, plaintiff could not have recovered the purchase price from the vendees, since the sale was not complete without delivery of the property free on board the cars at Omaha. This is the construction placed on the contract by plaintiff and defendants in the pleadings, as a reference thereto will show. Each party has pleaded *in hæc verba* the correspondence which constitutes the contract under which the consignments were made. The petition avers that the lumber was sold "to be delivered at Omaha, Nebraska, free of freight on board the cars at Omaha;" and the answer expressly admits the sale of the lumber as alleged in the petition. Each party, therefore, has construed the contract as calling for the delivery of the lumber at Omaha, and not Waldo, and the court is certainly justified in adopting the construction which the parties themselves have admitted to be the proper one. That the delivery was to be made in Omaha is emphasized by the following averment in the answer: "The defendant further answering alleges that before the time mentioned in the petition, and before Simpson, Perkins & Co. had purchased the lumber referred to from the plaintiff they had entered into an agreement with the said C. N. Deitz, of Omaha, to sell and deliver to him at said city, at certain agreed prices, a large quantity of lumber of the kind described in the petition, and that the said Simpson, Perkins & Co. to carry out the agreement purchased of the plaintiff the lumber aforesaid, and at the same time requested the plaintiff to promptly ship it to C. N. Deitz. That the plaintiff, in compliance with such request, delivered the lumber to the said St. Louis & South Western Railway Company, to be transported by it and other connecting carriers to Omaha and there deliver to C. N. Deitz." This is an admission that Omaha was the place of delivery of the lumber. The delivery to a carrier is regarded as delivery to the buyer only when, and as, it is in accord with the

terms and intention of the shipment.   In the case at bar
the carrier was the bailee or agent of plaintiff, and not of
Simpson, Perkins & Co., and the title to the lumber did
not vest in them until its arrival in Omaha free of expense
of transportation to the purchasers.   This conclusion is
not without abundant support in the authorities.

In Benjamin, Sales [6th ed.] sec. 682, the author says:
"In many mercantile contracts it is stipulated that the
vendor shall deliver the goods 'f. o. b.,' *i. e.*, 'free on
board.'   The meaning of these words is that the seller is
to put the goods on board at his own expense on account
of the person for whom they are shipped, and the goods
are at the risk of the buyer from the time when they are
so put on board."   At section 693 it is stated: "If, how-
ever, the vendor should sell goods, undertaking to make
the delivery himself at a distant place, thus assuming the
risks of the carriage, the carrier is the vendor's agent."

In *Knapp Electrical Works v. New York Insulated Wire
Co.*, 42 N. E. Rep. [Ill.] 147, it was held that a contract
for the consignment of goods "f. o. b." place of shipment
implies that the consignee is to pay the freight to the
place of destination.

In *Miller v. Seaman*, 176 Pa. St. 291, the facts were
these: February 21, 1894, one Miller contracted for the
sale to the defendants of eleven piles of lumber in the
yards of the Dent Lumber Company, at Du Boistown,
Pennsylvania, marked "A. G. M." and numbered and
mentioned in the schedule annexed to the contract, "at
and for $8.25 per 1,000 shipping count, f. o. b. cars Will-
iamsport, to be loaded, inspected, and measured as
ordered by said purchasers, by Mr. Sam Aurand for the
sellers."   The contract further stipulated for inspection
and measuring all lumber not loaded on cars prior to
June 1, 1894, and the same to be paid for on that date at
$8 per 1,000 feet, less two per cent. discount.   The ex-
penses of the inspection and measurement of lumber in
yard on said date to be borne by the purchasers.   Before
June 1, a portion of the lumber was destroyed by flood,

and Miller brought suit to recover the value of the lumber thus lost. A nonsuit was entered, the trial court holding that the title did not pass from Miller, under the contract, until the lumber was measured and inspected, and delivered at his expense f. o. b. cars Williamsport to the purchasers. The judgment was affirmed, the court in the opinion saying: "It is clear that the defendants had no right to take possession of these piles, as piles of lumber. If they had attempted it, Miller could have proceeded either by replevin or trespass against them. They could not have sold the lumber in a lump and delivered it to a purchaser. They could only take or sell in accordance with their contract. Their title to each shipment vested on its delivery f. o. b. to them at Williamsport. The lumber swept away by the flood had not been ordered by the purchaser; it had not been inspected, measured, or loaded by the seller and delivered at Williamsport to the buyer. * * * The title had left the plaintiff only as orders had been filled and shipped, and as to all that remained in the yard, it had never left him."

In *Sheffield Furnace Co. v. Hull Coal & Coke Co.*, 101 Ala. 446, there was under consideration a contract containing a provision for the sale and purchase of "Flat Top Coke at $5.10 per net ton (2,000 lbs.) f. o. b. cars Sheffield, Ala.," which was the place of destination of the coke. The court, in discussing the meaning of the letters "f. o. b." in contracts of sale, observed: "They import that the purchaser shall be free from all expense which may have attended the shipment and transportation to the point named. Had the provision related to the initial point of the transportation, the buyer would have been entitled to the shipment at that place free from all expense incident to loading the cars—all expense indeed incurred in the premises up to and including the loading of the cars. Then it would have been upon the buyer to pay the freight—the cost of transportation—to the final destination of the consignment. The provision here having relation to the point of final delivery, it can mean noth-

ing else than that the seller is to pay all costs and charges up to that point, and that the buyer is entitled to receive the consignment free from all such costs and expenses."

*Capehart v. Furman Farm Improvement Co.*, 103 Ala. 671, was an action by a consignor against a carrier to recover damages for loss and injury sustained in the transportation of certain goods which were purchased by Scott & Ray from plaintiff to be shipped from Atlanta, Georgia, to Guntersville, Alabama, consigned to purchasers. The contract of sale provided the goods were to be delivered "f. o. b. at Guntersville, Ala." The court, in the opinion, say: "It is admitted that f. o. b. means 'free on board.' Indeed, we judicially know the fact. (*Sheffield Furnace Co. v. Hull Coal & Coke Co.*, 101 Ala. 446.) The effect of the stipulation is that the consignor will place the goods, loaded on the car or vessel wherein transported, at the designated point of destination, free of all expense to the consignee. (*Sheffield Furnace Co. v. Hull Coal & Coke Co., supra.*) When, therefore, the plaintiff paid the freight charges and caused the boat to be landed at Guntersville, with the goods safely thereon, properly consigned to Scott & Ray, it completely fulfilled its contract; the carrier ceased to be its agents for the custody and care of the goods, and immediately became the agent of the consignees. The relations of the parties then became precisely the same, in effect, as if the contract of the plaintiff had been delivered f. o. b. at Atlanta, and the loss or injury had occurred en route, before reaching Guntersville. In such case, the carriers would have been regarded as the agents of the consignees, and the delivery to them f. o. b. at Atlanta would have passed the title to the consignee. This contract is not susceptible of any other construction."

There is no question that, under the contract, plaintiff was required to pay the freight on the lumber from Waldo to Omaha, which fact raises the presumption that the intention was that delivery was to be made by the

seller, and at its risk, at Omaha, and that the title did not vest in the vendees until the lumber arrived in that city.

In *Murray v. Nichols Mfg. Co.*, 11 N. Y. Supp. 734, glassware was shipped by plaintiff in Connecticut for delivery to defendant in New York, the seller paying the freight. It was ruled that the risk of transportation was on the latter, and no recovery could be had for the goods broken before their arrival at place of destination.

*Devine v. Edwards*, 101 Ill. 138, was an action to recover a sum alleged to be due for a quantity of milk shipped by plaintiff to defendant from Dundee, Illinois, to Chicago, under a contract whereby plaintiff was to pay the freight. There was evidence tending to show that some of the milk spilled from the cans while on the cars, and one of the questions was who was to stand this loss. The decision of the court is expressed in the second subdivision of the syllabus as follows: "Where a contract for the sale and delivery of personalty such as milk expressly provides that it is to be shipped by the seller to the place of business of the purchaser, *  * and any loss on the way must fall upon the seller."

In *Suit v. Woodhall*, 113 Mass. 391, a traveling salesman for plaintiffs, who were wholesale liquor dealers in Louisville, Kentucky, took the order of the defendants at Lawrence, Massachusetts, for a quantity of liquors, at a stipulated price subject to the order of plaintiffs. It was agreed that there should be deducted from the price all sums which defendants should pay for freight upon the liquors from Louisville to Lawrence. The liquors were delivered to the carrier for transportation as agreed, and it was held that the title remained in the vendors during the course of transportation, and the sale was not complete until the delivery of the liquors at the place of destination in Lawrence. To the same effect, as to completion of sale at place of delivery, is *Weil v. Golden*, 141 Mass. 364.

The third and fourth paragraphs of the syllabus in

*Julius Winkelmeyer Brewing Ass'n v. Nipp*, 50 Pac. Rep. [Kan.] 956, are as follows:

"3. Ordinarily, a delivery of merchandise to the carrier is a delivery to the purchaser, but when the seller pays the freight the carrier is his agent, and the delivery is made at the place of its destination.

"4. Where the freight charges are to be paid in the first instance by the purchaser, but are to be charged to the seller, and deducted from the price of the merchandise, held, that the seller pays the freight."

It is asserted that *Wagner v. Breed*, 29 Neb. 720, is decisive of the question against the contention of plaintiff, and that it was therein solemnly adjudicated "the mere fact that a vendor pays the freight is of itself sufficient evidence to overthrow the presumption that where a purchaser orders goods from a distant seller, and he in pursuance of the order delivers the goods to a carrier for shipment to the vendor, such delivery is a delivery to the vendee and that his title at once attaches." This doctrine was not announced in that case, as an examination of the decision will disclose. The suit was to foreclose a real estate mortgage given for the purchase price of beer sold and shipped by Wagner, a wholesale dealer in liquors at Rock Island, Illinois, to one Breed, the mortgagor, at Hastings, this state. The defense interposed was that the sale was made in Nebraska, and therefore void, inasmuch as Wagner had no license to sell intoxicating liquors here. The beer was shipped to Breed from Rock Island to Hastings in car load lots by a common carrier of his own selection and designation, and the vendee uniformly paid freight on the shipment, which was afterwards credited back to him in his account by plaintiff, for the purpose of reducing the price of the beer to conform to the usual price then obtaining. The court in the opinion say: "These sales of beer by the plaintiff to the defendant William Breed, upon which the indebtedness sued on arose, were made and concluded at Rock Island, in the state of Illinois." That case is not an au-

thority for the proposition that the title of this lumber
passed from the vendor at the place of shipment, because
it was shipped under an agreement requiring the plain-
tiff herein to pay the freight to Omaha, who selected the
carrier, and contracted to deliver the lumber free of ex-
pense on board cars at that point. The beer was not
shipped under a contract containing any such provisions.
In that case the vendee, and not the vendor, designated
the carrier and paid the freight, and the court properly
held that the sales were made in Illinois, and not in this
state.

Of the cases decided by this court the one which more
nearly fits the one at bar is *Havens v. Grand Island Light
& Fuel Co.*, 41 Neb. 153. That was an action to recover
the contract price of a car of coal shipped by plaintiff
from Omaha to defendant at Grand Island. One of the
defenses was that the quantity of coal sued for was not
received at the place of destination. Plaintiff insisted
that the title of the coal vested in the fuel company upon
the delivery to the carrier at Omaha, and if a less amount
of coal was received by purchaser than was delivered to
the carrier, the loss must be borne by the defendant.
The court held the evidence supported the findings of the
jury that the coal was to be delivered at Grand Island,
saying: "The general rule doubtless is that the delivery
of goods to a carrier consigned to the purchaser is a de-
livery to the purchaser, and that the title of the goods so
delivered to the carrier at once vests in the purchaser;
but this rule is by no means universal, and whether appli-
cable in any case, depends upon the facts, circumstance,
and the contract between the seller and the purchaser in
the case. * * * It is not stated in any of the plead-
ings in the case at what place this coal was to be deliv-
ered, and if the jury found from the evidence that the
coal was to be delivered at Grand Island, we think the
evidence ample to sustain that finding. By the letter
of October 16, written by Havens & Co. to the fuel com-
pany, it is stated: 'We have your favor of the 15th and

have entered your order for two cars of grate coal at $9.85 per ton f. o. b. at Grand Island;' * * * and it also appears from the record that Havens & Co. accepted from the fuel company, as part payment of the other car of coal shipped with the one in suit, the freight bills for the coal turned over by the carrier to the fuel company. To adopt the contention of counsel that by the terms of the contract the fuel company was to pay $9.85 per ton for the coal at the place of delivery, and that that place of delivery was Omaha, would make the coal cost the fuel company in Grand Island about $16 per ton, as the evidence shows that the carrier's charges amounted to about $6 per ton."

*Tregelles v. Sewell*, 7 H. & N. [Eng.] 573, is distinguishable from the case at bar. That was an action to recover damages for the non-delivery of a quantity of bridge rails purchased under a contract whereby the buyer agreed to pay therefor "5l. 14s. 6d. per ton, to be delivered at Harburgh, costs, freight, and insurance; payment by net cash in London, less freight, upon handing bill of lading and policy of insurance." The seller delivered the rails on boat at London, received the usual bill of lading, making the shipment deliverable at Harburgh, procured, at his own expense, a policy of insurance on the shipment, which, with the bill of lading indorsed in blank, was delivered to the buyer, and the latter then paid the contract price of the iron, less the amount of the freight payable under the bill of lading. It was decided that the seller was not required to make delivery at the final place of destination, and that the title passed on the delivery of the bill of lading and policy of insurance to the vendee. That case is in many respects unlike the one before us. There the vendee was to, and did, pay the purchase money on delivery of the iron to the carrier, and the vendor then paid the freight to the buyer and delivered the bill of lading to him, so that there was nothing left for the seller to do to vest the title in the other party. In the present case the purchase money was not paid, nor

the freight on the lumber, and the consignor retained possession of the bills of lading. The contract, therefore, had not been fully performed by the plaintiff.

It is urged that inasmuch as the lumber was not consigned to the plaintiff, or its order, and that the bills of lading were taken in the name of the consignee, the inference may be drawn therefrom that it was the intention of plaintiff that the title to the lumber should pass immediately upon the delivery to the carrier at Waldo. This argument is not tenable, because the bills of lading were never surrendered to the consignee or purchaser, but at all times remaining in the possession of plaintiff. Although ordinarily the rule is, when not rebutted by evidence to the contrary, that the title to goods *prima facie* passes to a vendee upon their delivery by the vendor to a common carrier for transportation to the buyer, yet where a bill of lading is taken in the name of the seller, it is presumptive evidence of his intention to retain control of the property, and that delivery to the carrier is not a delivery to the buyer, but that the carrier is the bailee or agent of the vendor. (Newmark, Sales sec. 147; Benjamin, Sales sec. 399.) On the other hand, if the bill of lading, by direction of vendor, is issued in the name of the consignee and is sent or delivered to him, this is evidence of an intention to transfer the title to the purchaser. "But the fact that the bill of lading is taken in the buyer's name, if it is not delivered, creates no presumption of an intention to transfer the property unconditionally." (Newmark, Sales sec. 150; *Sheridan v. New Quay Co.*, 93 Eng. Com. Law 618; Usher, Sales sec. 233; *Bank of Rochester v. Jones*, 4 N. Y. 497; 2 Am. & Eng. Ency. Law 243, 244; *Thomas v. First Nat. Bank*, 66 Ill. App. 56; *Michigan C. R. Co. v. Phillips*, 60 Ill. 190.)

In 2 Am. & Eng. Ency. of Law 242, it is said: "Where goods are consigned without reservation on the part of the consignor, the *prima facie* legal presumption is that the consignee is the owner. The fact of consignment does not vest an absolute title in the consignee. His

title is not complete until the bill of lading comes into his hands."

.Lord Denman, in *Mitchell v. Ede*, 11 Ad. & E. [Eng.] 888, with reference to a bill of lading, says: "As between the owner and shipper of the goods and the captain, it fixes and determines the duty of the latter as to the person, to whom it is (at the time) the pleasure of the former, that the goods shall be delivered. But there is nothing final or irrevocable in its nature. The owner of the goods may change his purpose, at any rate before the delivery of the goods themselves, or of the bill of lading to the party named in it, and may order the delivery to be to some other person, to B instead of to A."

It is obvious that the true construction of the contract of purchase and sale involved in the present case is that plaintiff's agreement was not performed until the delivery of the lumber free on board the cars in Omaha, and that the title was not divested until the shipment arrived in that city. Plaintiff, therefore, without regard to the solvency or insolvency of Simpson, Perkins. & Co., had the undoubted right to stop the delivery of the lumber at any time during the course of transportation, which right was duly exercised before at least 11 cars had arrived at the place of their final destination. The defendant, however, delivered the lumber to the consignee, Deitz, notwithstanding it had received timely notice not to do so. Such delivery was, therefore, at the risk of the carrier, and it is liable as for conversion. (*Gates v. Chicago, B. & Q. R. Co.*, 42 Neb. 379; *Shellenberg v. Fremont, E. & M. V. R. Co.*, 45 Neb. 487.) The judgment should be reversed and the cause remanded.