**MURRAY v. CHICAGO, ST. P., M. & O.
RY. CO.
CHICAGO, ST. P., M. & O. RY. CO. v.
MURRAY.
Nos. 4919, 4933.**

Circuit Court of Appeals, Seventh Circuit.
May 19, 1933.

Edward D. Pomeroy and Henry T. Martin, both of Chicago, Ill., for Thomas F. Murray.

William T. Faricy, Nelson J. Wilcox, Nelson Trottman, and I. C. Belden, all of Chicago, Ill., for Chicago, St. P., M. & O. Ry. Co.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge (after stating the facts as above).

On July 8, 1921, Murray and the Omaha entered into three contracts which were identical except as to tonnage and the location of the mines from which the coal was to be taken. They provided for the sale by Murray to the Omaha over a period of nine months from July 1, 1921, to March 31, 1922, of certain amounts of coal at a price of $2.70 per ton for mine run, and $2.90 per ton for egg coal, f. o. b. Peoria, or Hollis, Illinois. Under these contracts mine run coal was shipped pursuant to regular orders placed from time to time by the Omaha, but no egg coal was ordered. The total contract price of the coal shipped, not including transportation charges, was $467,601.56. Invoices for these shipments were sent to the Omaha which in turn

paid Murray therefor sums aggregating $444,038.82. The difference amounting to $23,562.74 represents certain transportation charges paid by the Omaha and withheld, as the Omaha contends, pursuant to provisions of the contracts which required Murray to pay therefor. The seventh paragraph of each contract provided that the Omaha was to pay Murray the prices above mentioned f. o. b. cars, Chicago and Northwestern tracks either at Peoria, Illinois, or at Hollis, Illinois. The eighth paragraph of each contract was as follows:

"It is understood that the Contractor assumes all charges for switching and freight from mine or mines to the C&NW Ry. tracks either at Peoria, Ill., or Hollis, Ill., and guarantees that the Railway shall not pay more than $2.191 per ton including war tax to the C&NW Railway Co., based on present freight rate of $3.04 per ton C&NW tracks Peoria, Ill. to Garden City, Minn., of which C&NW Railway receives 70%. Should the present freight rate of $3.04 be changed before the termination of this contract, this guaranty shall be increased or decreased on the same basis, and should any coal shipped under this contract to the Railway be billed on any different basis than above that will cause the Railway to pay more than $2.191 per ton, the Contractor authorizes the Railway to charge the Contractor with such difference by deducting same from face of Contractor's invoices covering said coal."

Each of the mines from which the coal was supplied was located on the tracks of a carrier other than the Omaha or the Chicago and Northwestern Railway, hereinafter referred to as the Northwestern; and in each contract reference was made to the road upon which the mine or mines were located. One contract provided for delivery of 35,000 tons from the La Marsh Mine No. 2, located at La Marsh, Illinois, on the Peoria, Hanna City and Western Railway. Another contract provided for the delivery of 70,000 tons from the Hanna and Empire mines, located respectively at Hanna, and Logan, Illinois, on the Minneapolis and St. Louis Railway, and the Peoria, Hanna City and Western Railway. The third contract provided for the delivery of 65,000 tons from La Marsh Mine No. 1, located on the Peoria, Hanna City and Western Railway. By consent of all the parties some coal was supplied under these contracts by the seller from the Glasford and Mapleton mines which were located on the Toledo, Peoria and Western Railway. The railways upon which the mines were located are herein referred to as the initial carriers.

There is no controversy concerning the amount of coal purchased. By order of the purchaser it was shipped as through freight by way of Peoria, or Hollis, Illinois, hereinafter referred to as Peoria, to Garden City, Minnesota, a point on its own lines. All the coal furnished under these contracts traveled from the several mines over the lines of the initial carriers to Peoria, and thence via the Northwestern to Blue Earth, Minnesota, the junction point with the Omaha, thence via the Omaha to its destination.

The joint through rate from each of these mines to Garden City, Minnesota, was $3.04 per ton. That also was the through rate from Peoria to Garden City. When a through rate is established over more than one railway, that rate may be, and is distributed between or among the several carriers affected, in such proportions as said carriers may agree upon, and with that distribution the Interstate Commerce Commission is not primarily concerned.

In the case of shipments between Peoria and Garden City, moving over the Omaha and Northwestern lines, the through rate of $3.04 per ton was divided by those carriers in the ratio of seventy per cent (or $2.128) to the Northwestern, and thirty per cent (or $.912) to the Omaha. However, in the case of shipments from the mines to Garden City, which were governed by the same rate, a different distribution was rendered necessary by reason of the fact that the initial carriers from the mines to Peoria must be compensated. Wherefore the rate of $3.04 was, during the period in question (except during March, 1922, when there was a special switching tariff of $7.00 per car in the case of shipments from the La Marsh mines), divided by agreement of all the roads affected in the following manner:

| Mine | Initial Carriers' Proportion | Northwestern Proportion | Omaha Proportion | Total |
|---|---|---|---|---|
| La Marsh (including No. 1 and No. 2) | .34 | 1.89 | .81 | 3.04 |
| Empire (including Hanna Mine) | .61 | 1.701 | .729 | 3.04 |
| Glasford (including Atlas and Mapleton) | .57 | 1.729 | .741 | 3.04 |
| During March, 1922, when said switching tariff was in effect in the case of said La Marsh mines, the divisions were | .14901* | 2.023693 | .867297 | 3.04 |

*Switching tariff of $7.00 per car reduced to tons.

Thus it will be observed that the shipments of the coal in controversy from the mines located on the initial lines netted the other carriers less per ton than they otherwise would have received had the mines been located on the Northwestern, and that loss was absorbed by the Northwestern and the Omaha in the respective proportions of seventy per cent and thirty per cent.

It will be observed that paragraph 8 of the contract contains a guaranty on the part of Murray that the Omaha shall not be required to pay to the Northwestern as freight more than $2.191 per ton including war tax. That amount constitutes the maximum sum obtainable, with respect to coal shipped from any of the mines, by combining the amount received by the Northwestern on any shipment with seventy per cent of the corresponding amount received by the initial carrier plus a three per cent war tax upon those two amounts. No controversy is raised relative to the war tax, but this provision casts light upon the intention of the parties in construing other parts of paragraph 8 concerning which there are differences of opinion. It is admitted that the Omaha had a right to and did "dead head" the coal in question over its own line, which means that it was not required to pay to itself its own share of the freight rate. However, the Interstate Commerce Act did require that the connecting carriers should be paid their full proportionate share of the established rate, and those payments were made by the Omaha.

With relation to the coal coming from the La Marsh mines, which is typical of all the coal shipped, the established rate was accounted for as follows:

Received by initial carriers from the Omaha.... .34
Received by Northwestern from the Omaha..... 1.89
"Dead headed" by the Omaha.................... .81

Established rate .............................. 3.04

In paying for the coal, the Omaha deducted and retained from the invoice price of $2.70 per ton, thirty per cent of the initial carriers' charges from the mines to Peoria because the coal was purchased f. o. b. at that point. The thirty per cent deduction from the invoice price represented that proportion of the initial carriers' charges which the Omaha, in the division sheets, had formerly absorbed in order to provide compensation for the initial carriers in transporting the coal from the mines to Peoria in through shipments from the mines to Garden City, Minnesota. The amounts per ton received by the several initial carriers under the division sheets were not the same, but the per cent

of absorption and deduction by the Omaha was the same as to each, and the aggregate of those deductions constitutes the amount which Murray seeks to recover.

It is contended by Murray that paragraph 8 of the contracts should be so interpreted as to require him to pay the switching and freight charges from the mines to Peoria only in case there were such charges which by virtue of an existing tariff could have been either lawfully assessed or paid, or collected from any other shipper for a like service. That there were such charges he denies, and insists that to apply the carriers' division sheets to his shipments, as contended by the Omaha, would be to discriminate unlawfully between shippers and would result in the collection of transportation charges in excess of the lawful through rate of $3.04 from the mines to Garden City. He therefore requests the court to declare paragraph 8 ambiguous and to construe it in the manner suggested in order to render its obligations legal, rather than illegal.

To adopt Murray's construction would be in effect to add after the words "Contractor (Murray) assumes all charges for switching and freight from mine or mines to the C&NW Ry. tracks either at Peoria, Ill. or Hollis, Ill." The following words, "if there be such charges which can be lawfully assessed against the contractor (Murray) or against the shipments, and for which there was some express tariff authority." Of course the court recognizes the rule that where the language of a contract is ambiguous, and by reason thereof is subject to two constructions, one of which would render the obligation legal, and the other illegal, the parties will be presumed to have intended to do legal acts and the court will adopt that construction which produces legal results. But the application of this rule always presupposes an ambiguity. There is a vast difference between an ambiguous contract and one which in plain and unambiguous terms obligates the parties to do illegal acts. Paragraph 8 of the contracts before us is not ambiguous, and the record shows that those contracts were entered into by the parties with full knowledge of all the facts and with complete knowledge of the law applicable thereto. Murray was the party who charged ambiguity, and because of that charge the court very properly permitted the other party to introduce evidence as to the intention of both of them prior to the signing of the contracts. Good v. Martin, 95 U. S. 90, 24 L. Ed. 341; Wolf v. Schwill, 289 Ill. 190, 124 N. E. 389; Gil-

lett v. Teel, 272 Ill. 106, 111 N. E. 722; Wood v. Clark, 121 Ill. 359, 12 N. E. 271; Seitz v. Zukowski, 194 Wis. 78, 215 N. W. 939. The evidence thus admitted consisted of certain testimony of witness Nelson and letters identified as having been written by Murray concerning matters occurring prior to the signing of the contracts. They did not tend to vary the written contracts, but bore directly upon the intention of the parties at the time the contracts were executed, and conclusively prove that the contracts express very clearly and without ambiguity the things which all the parties had in mind.

The evidence discloses that Murray was quite anxious to sell coal to the Omaha. His mines were not located on the Northwestern. He knew that the through freight rate from Peoria, Illinois, to Garden City, Minnesota, was the same as from his mines to Garden City. He also knew that if the Omaha purchased his coal f. o. b. the mines it would cost that railroad more than coal produced from mines located on the Northwestern because of the fact that the Omaha was compelled to absorb a part of the freight incident to the transportation of Murray's coal from his mines to the Northwestern, and for these reasons he could not hope to compete successfully with mines on the Northwestern in the sale of coal to the Omaha. With these facts in mind Murray made the proposition contained in the contracts, to sell the coal f. o. b. Peoria, and specifically agreed to assume all charges for switching and freight incident to transporting the coal from his mines to Peoria. Whatever may be said as to the legality or illegality of the contracts, their terms can not be considered ambiguous in the light of the evidence disclosed by the record.

■ We are convinced, however, that the contracts are in no respect illegal. See Illinois Central R. Co. v. Brooks-Scanlon Co. (C. C. A.) 241 F. 445. It is quite true that in establishing a through rate from the mines to Garden City, no separate tariff was established for that portion of the route from the mines to Peoria. So far as we are informed, the rate making body does not establish separate rates for fractional parts of a through rate, and the division of the through rate is always accomplished by agreement of the roads affected. Whether that division, if inequitable or unreasonable, is subject to supervision by the rate making body, is unnecessary for us to decide, because it is not contended here that the division was either inequitable or unreasonable.

It is argued by Murray that because the through rate from the mines is the same as that from Peoria, there can be no charge made from the mines to Peoria, but that contention is without merit. It is quite obvious that the initial carrier could not be required to transport the coal to Peoria without compensation, and the law did not prevent the Northwestern and the Omaha and the initial carrier from agreeing upon at least a reasonable division of the through rate, providing the aggregate did not exceed the established rate of $3.04. In the instant case the freight paid by the Omaha, including the amount "dead headed" over their own lines, exactly corresponded to the established rate.

It is contended, however, by Murray that if the Omaha be permitted to deduct from the price of the coal thirty per cent of the amount paid by it to the initial carrier, the established freight rate will be exceeded by that amount, and the contract price for the coal will be correspondingly decreased. This contention is not sound. The amount deducted from the invoice price of the coal was not for freight which the Omaha claims was due it as such, but it was for money paid by the Omaha for Murray which he had agreed to pay in order to sell his coal to the Omaha at $2.70 per ton, and was clearly a limitation of the purchase price. Pond Creek Mill & Elevator Co. v. Clark (C. C. A.) 270 F. 482; Ill. Cent. R. Co. v. Brooks-Scanlon Co., supra; Neimeyer Lumber Co. v. Burlington & M. R. R. Co., 54 Neb. 321, 74 N. W. 670, 40 L. R. A. 534; Lee v. Northway Motor Sales Co. (R. I.) 121 A. 425. Of course the deduction, if allowed, will reduce the invoice price of the coal by that amount, and it should be so reduced in order to conform to the contracts. By those contracts Murray agreed to sell the coal at $2.70 per ton f. o. b. the Northwestern at Peoria, and he failed to pay for the delivery. The Omaha was compelled to pay for that delivery, and its deductions for the amount so paid were properly made from the invoice price. Ill. Cent. R. Co. v. Brooks-Scanlon Co., supra.

■ The cross appeal of the Omaha was predicated upon the court's failure to award an affirmative judgment on the counter claim in its favor for seventy per cent of the initial carriers' charges which was also paid by it. Counsel for the Omaha candidly admits that the deductions made by it on the basis of $2.191 per ton as referred to in paragraph 8 of the contracts indicate a practical construction of the contracts at variance with cross appel-

lant's counter claim. With this statement we are in accord, and we are of the opinion that the trial court was right in so holding.

Judgment affirmed.